UNITED STATES DISTRICT COURT

**JUDGE ROBINSON**

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

JOHN J. BYRNES, JR.,

**08 CIV. 0086**

                            Plaintiff,

**COMPLAINT**

    -against-

Civil Action

Case No.

STEVEN BRESCIA, Mayor of the Village of
Montgomery, and LINDA CANTIELLO,
ROBERT "RABBIT" KIERNAN,
DARLENE ANDOLSEK, and JOANN SCHEELS,
Constituting the Trustees of the Village Board
of the Village of Montgomery, Lt. JERRY LOMANGINO
of the Village of Montgomery Police Department, and
THE VILLAGE OF MONTGOMERY,

                          Defendants.

-----------------------------------------------------------x

        Plaintiff, JOHN J. BYRNES, JR., by his attorney, EDWARD

J. CARROLL, ESQ., complaining of the defendants herein, respectfully shows

this Court and alleges as follows:

## JURISDICTION-VENUE

    1. Upon information and belief, this Court has jurisdiction in that this

action is brought under the authority of Title 42, United States Code, § 1983 and

1985; Title 28, United States Code, § 1331, 1334(a)(1)(2)(3)(4), 1343, 2201, and

-1-



2202.  Plaintiff seeks redress for the deprivation and violation of his

constitutional rights alleging at all times hereinafter mentioned that the

defendants, while acting under color of the State Law, deprived the plaintiff of his

rights, privileges and quality of life secured by the Constitutions of the United

States and the State of New York, including its/their applicable amendments

thereto.  Federal jurisdiction also exists in that this action arises under Federal

Law and is brought pursuant to 28 U.S.C § 1331, and 42 U.S.C. § 1983 in that it

involves a violation of Civil Rights with the matter in controversy exceeding

$20,000.00, exclusive of interest, costs, fees and disbursements. Plaintiff also

seeks the recovery of counsel fees incurred in bringing and prosecuting this

federal action.

2.  This Court also has subject matter jurisdiction to enter preliminary and

final judgments granting plaintiff declaratory and injunctive relief which are

sought herein under Title 28 of the United Sates Code, § 1331, 1343(a) (4), 2201

and 2202 to prevent the further deprivation of plaintiff's Constitutional rights,

privileges, and immunities secured by the Constitution of the United States, as a

result of acts by the defendants made under color of state law; for an order

declaring unconstitutional the discriminatory acts of defendants, and for money

damages necessary to redress the injury caused to plaintiff by the unconstitutional acts of defendants. Injunctive relief must be granted to plaintiff for the reasons set forth herein in that plaintiff has no plain, adequate or speedy remedy at law. In the event such relief is not granted to plaintiff by this honorable Court, the actions of the defendants have and will continue to cause immediate and irreparable injury to the plaintiff.

3. Plaintiff further invokes the pendant jurisdiction of this Court to also consider claims arising under State Law. Plaintiff alleges that, at all times hereinafter mentioned, the acts by and/or the omissions of the defendants, constituting defamation of character, malicious termination of employment, the malicious publication of untrue, slanderous, libelous and scandalous statements, and intentional infliction of mental distress, together with all other acts complained of herein were committed with gross malice, and were uttered, and/or published within the defendant(s)' scope and in furtherance of their authority as public officers.

4. That this lawsuit is properly venued in that the acts of the defendants, individually and/or by acting in concert through its, his, her and/or their officers, agents, servants and/or employees occurred within the territorial boundaries of

–3–

the Southern District of the State of New York.

    5. That the following history of the municipal defendant, acting by its officers and/or through its legislative authority, establishes gross malice and a custom or policy of deliberate indifference to the rights of plaintiff to enjoy his profession and livelihood and a deprivation of those rights which were and still are guaranteed to him as a citizen and public officer of the United States of America.

    6. All of the following acts of the defendants have resulted in a confiscatory taking of plaintiff's property rights and/or his "liberty rights" to pursue his occupation and avocation and to continue his profession and/or employment, and/or to hold his tenured position for the purpose of earning a livelihood as "Chief of Police" of the Village of Montgomery Police Force.  This taking occurred without just compensation, and/or a hearing, and resulted in a violation of plaintiff's rights to equal protection of the laws and due process afforded him by the Fourteenth Amendment of the Constitution of the United States.  The plaintiff is informed and believes that as a result of several well publicized actions involving the plaintiff, his medical condition, and allegations made by the defendants of criminal conduct allegedly involving his being a

–4–

pedophile and seller/purchaser and/or owner of illegal firearms which, due to the actions of the defendants, were published in newspapers of general circulation, that he was not afforded a presumption of innocence by the defendant Village Board members when they voted to demote and remove him from the position of "Chief of Police" after unlawfully changing his designation as such to "Officer in Charge" and that he was treated in a manner differently from similarly situated public servants.

7. Upon information and belief, all of the following acts were done for the purpose of violating the civil rights of the plaintiff and depriving him of his position of "Chief of Police" and/or thereafter unlawfully referring to him as "Officer in Charge" and/or "police officer", and were done with the knowledge and intent of the defendants to accomplish the foregoing, without any just cause or legitimate reason, but for the sole purpose of depriving plaintiff, without due process, of his position as the "Chief of Police" and/or "police officer", and the right to pursue that livelihood and to obtain just compensation from those positions. Furthermore, the defendants, at all times herein, acted with knowledge that the publications and statements so made were false, or with reckless disregard if it (they) was false or not. Therefore, they acted with "actual malice."

## THE PARTIES

8. That at all times herein mentioned, plaintiff, JOHN J. BYRNES JR., was and still is a resident at 100 Washington Avenue, Montgomery, Orange County, New York, 12549, and a citizen of the United States of America.

9. Upon information and belief and at all times herein mentioned, the defendant, STEVEN BRESCIA, was and still is the Mayor of the Village of Montgomery; LINDA CANTIELLO, ROBERT "RABBIT" KIERNAN, DARLENE ANDOLSEK, and JOANN SCHEELS, were and still are Trustees of the Village Board of the Village of Montgomery; and defendant Lt. JERRY LOMANGINO, was and still is a police officer who aided and abetted the defendants, while employed by the Village of Montgomery Police Department, State of New York in the acts complained of herein. All of these defendants acted, and still act in the capacity of those above described positions, and were and still are residents of Counties situated within the territorial jurisdiction of the District Court for the Southern District of New York.

10. That all of the defendant(s)' illegal acts complained of herein, were committed to deprive the plaintiff of his Constitutional rights and were carried out within the scope of the defendant(s)' authority, under color of state law, and in

–6–

furtherance of the defendant(s)' public and/or private positions and duties.

11.  Upon information and belief and at all times hereinafter mentioned, defendant, THE VILLAGE OF MONTGOMERY, was and still is a municipal corporation, incorporated under and by virtue of the laws of the State of New York, with its principal place of business situated at 133 Clinton Street, Montgomery, New York, County of Orange, 12549.

## FACTUAL ALLEGATIONS

### Plaintiff's History Prior to Demotion

12.  Throughout plaintiff's employment with the Village of Montgomery police force, plaintiff, for over twenty four years, has maintained an outstanding record of excellence and has been recognized, throughout law enforcement agencies and the public, for his meritorious service to his profession. Plaintiff has been loyally and capably employed by defendants and performed his duties as a Montgomery police officer since 1983.

13.  Plaintiff, in that position, has also held the office of "Chief of Police" of the Village of Montgomery Police Force for more than thirteen years.  He is, and has remained, a native of Montgomery, New York after having graduated from Valley Central High School and was and still is a dedicated public servant.

14. As a result of the foregoing, plaintiff at all times herein, was and still is a public employee, vested with rights as "Chief of Police" for the Village of Montgomery Police Department, who may not be removed from, or deprived of that position, nor may he be unlawfully referred to as "Officer in Charge", without legitimate due process which must include initial written charges establishing, if true, valid reasons for such removal, and after a reasonable opportunity, to prepare a defense, a hearing, at which time plaintiff must be granted an opportunity to confront his accuser(s), present evidence, and be heard.

15. During plaintiff's aforesaid employment, plaintiff has owned and operated a private security firm known as "Allstate Security". This business was operated with the knowledge, consent and approval of the defendants, and without any claims of conflict or protest.

16. In March 2006, while so employed by the Village of Montgomery Police Department, plaintiff reviewed numerous police department time sheets in response to complaints from trustee, ROBERT "RABBIT" KIERNAN, that officers in plaintiff's department were working excessive hours. In plaintiff's investigation, he discovered that there was, in fact, one officer, known as JERRY

LOMANGINO, who did appear to have worked excessive hours and more hours than were required under the circumstances.

17.  A comparison of the Village of Montgomery Police Department records with the Town of Fishkill Police Department records revealed that Officer LOMANGINO, on December 25th, 2005, had simultaneously billed each municipality for working, while on duty, on the same dates and times.

18.  During the following Village Board meeting, plaintiff advised Mayor STEVEN BRESCIA, ROBERT "RABBIT" KIERNAN, and the rest of the Village Board members of his findings and advised the board that JERRY LOMANGINO was engaged in an illegal practice commonly referred to as "double-dipping".  Although advised of such criminal conduct, defendant, ROBERT "RABBIT" KIERNAN, in response, and without just cause, reprimanded plaintiff, telling him to "shut up, there will be no more investigation on Mr. Lomangino."  Plaintiff's reply to that defendant was that, as long as he was "Chief of Police", a legitimate investigation of corruption would remain open.  The remaining defendants took no steps to curtail the actions of defendant, ROBERT "RABBIT" KIERNAN.

19.  During a subsequent Village Board meeting, when this issue was again raised, defendant ROBERT "RABBIT" KIERNAN stated he had "approved" of JERRY. LOMANGINO's submission of bills to both the Village of Montgomery and Town of Fishkill although he knew that the Montgomery bills were fraudulent.  Plaintiff advised defendant, ROBERT "RABBIT" KIERNAN that he had no authority to approve such an illegal act.  The defendant became irate and belligerent and began to yell and curse at the plaintiff.  The defendants thereafter, without the knowledge and/or consent of plaintiff, in lieu of prosecuting, and to spite plaintiff, did appoint JERRY. LOMANGINO to the position of Lieutenant in the Village of Montgomery Police Department.

20.  Defendant, LINDA CANTIELLO was formerly an employee of plaintiff's private security firm, Allstate Security, but her employment was terminated on April 18, 2000.  Thereafter, defendant, LINDA CANTIELLO, was elected to the public office of Village Trustee of the Village of Montgomery.  In a public meeting held on April 18, 2006, defendant, LINDA CANTIELLO, without just cause or reason, but instead to retaliate against the plaintiff, utilizing her public office for personal motives, stated, "If it is the last thing I do I am going to get Jack Byrnes out of the Chief's position."

–10–

21.  On or about August 2006, Trustee ROBERT "RABBIT" KIERNAN, in an effort to prevent the establishment of a police union, verbally threatened plaintiff that he must stay away from any support for the establishment of a police union.  This defendant threatened that he would retaliate against any officer voting for the union, including the plaintiff.  Defendant ROBERT "RABBIT" KIERNAN further threatened that "anyone dealing with the union, including you, will have to deal with me" and "if you know what is good for you, stay the fuck out of it".

22.  In a later incident during the month of December 2006, ROBERT "RABBIT" KIERNAN threatened a personal friend of plaintiff, John O'Brien, stating "don't you ever let me catch you talking to Jack (Byrnes) or else!"  John O'Brien was, at that time, seeking final approval for a Certificate of Occupancy for a building he owned.  ROBERT "RABBIT" KIERNAN was on the panel that approved variances required for O'Brien's Certificate of Occupancy at that time and had the ability to deny such certification.

23.  Prior to and including August, 2006, plaintiff was compensated, by salary, as "Chief of Police" for the Village Police Department.  However, plaintiff's physician informed him that he needed to have an operation for a

–11–

herniated navel.  Although his physician recommended that he undergo such

surgery immediately, plaintiff, to serve the best interests of the Village of

Montgomery, postponed that operation to attend a highly publicized public

ceremony, known as "General Montgomery Day".  To insure that he would be

available and physically able to attend that ceremony, to maintain public safety,

plaintiff rescheduled that operation for a date after the scheduled date of the

ceremony.  However, during the month of August, 2006, while in the Dominican

Republic, plaintiff's medical condition suddenly worsened, precluding a return to

the United States, and his hernia burst requiring immediate emergency surgery.

The only surgical procedure available in the Dominican Republic, at that time,

was outdated and required more recuperation time than if the surgery had been

performed in the United States.

    24.  Plaintiff immediately notified defendant, Mayor STEVEN BRESCIA

before he was rushed into surgery and remained in constant contact with him

thereafter to provide updates as to his condition.  Plaintiff requested a leave of

absence from his position for the period before and after the expected dates of his

surgery and for the minimum period medically required to ensure the health of

plaintiff and his successful recuperation and the defendants had been informed of

-12-

and are or should have been aware of this fact.  At this time, plaintiff was placed on medical leave from the Village of Montgomery Police Department and John Luffman was appointed temporary "Officer in Charge" in plaintiff's absence.

25.  After approximately one week of bed rest, plaintiff was again rushed into surgery because his hernia had returned.  The physicians reopened plaintiff's wound and performed a procedure whereby they scraped the inside of his stomach to stop any further spread of infection that had reached the first stages of gangrene.

26.  After that second surgery, plaintiff was ordered by his doctors in the Dominican Republic not to return to the United States but to remain "in bed" for a minimum of twelve weeks.  During that confinement, a "visiting nurse" was required each day to remove and change the gauze covering plaintiff's open wound.  The drain in his stomach also had to be cleaned out daily to avoid any further complications.  Instead of granting plaintiff's request, defendants arbitrarily imposed on plaintiff a period less than medically required under the circumstances and, although other employees of the Village of Montgomery had been granted such reasonable medical leave.  The defendants, acting individually and in concert, are responsible for the decision to refuse to allow plaintiff

–13–

employment for his tenured salaried position as "Chief of Police". This action is

therefore brought against the defendants, ROBERT "RABBIT" KIERNAN and

LINDA CANTIELLO individually and in their official capacities and the

remaining defendants in their official capacities.

## Violations of HIPPA

27. During that time, plaintiff received a telephone call from Alexa James,

a reporter for the "Times Herald-Record", who informed plaintiff that Oliver

Mackson had been contacted by defendant, trustee ROBERT "RABBIT"

KIERNAN who had provided that reporter with the verbatim contents of

plaintiff's confidential medical record. Plaintiff was required to provide this

information to the defendants, on the condition that it would be held in

confidence, and not released for further publication to the general public. When

plaintiff inquired of the reporter where she had acquired plaintiff's confidential

medical information, protected from disclosure by HIPPA, the reporter replied

that trustee, ROBERT "RABBIT" KIERNAN had, without providing any written

authorization signed by the plaintiff, released and provided all of plaintiff's

medical information to that reporter, knowing that it would be circulated and

−14−

published to the public through articles contained in newspapers of general circulation.

28.  Between November 2006 and January 2007, confidential medical information, protected from disclosure by HIPPA, was continually released to the media by defendants, without plaintiff's knowledge or consent.  This confidential information was subsequently published in various articles in the Times Herald-Record, a newspaper of general circulation, distributed to the general public throughout the State of New York and specifically within the Counties of Orange, Sullivan, and Ulster.  A copy of those publications are annexed hereto and made a part hereof collectively as Exhibit "A".

29.  Thereafter, in response to plaintiff's complaints of the foregoing, without due process or a hearing, the defendants changed the plaintiff's conditions of employment by substituting an hourly rate of pay for his salary and requiring him to meet minimum hours of employment.

## Plaintiff's Demotion

30.  Thereafter, plaintiff recuperated to the extent that he was medically allowed to return to the United States.  On December 5, 2006, while plaintiff was still on medical leave and his position was protected by law, without any hearing

–15–

or other due process, the defendants, acting as the Village Board of the Village of Montgomery, met in executive session to discuss police matters. Attendance was open only to the defendants, their village attorney, village clerk and acting "Chief" Luffman. Plaintiff timely requested that he also be granted permission to attend this meeting, but defendant, ROBERT "RABBIT" KIERNAN adamantly objected to his participation. Plaintiff attended the meeting over defendant's objections and when the issue of the criminal conduct of JERRY LOMANGINO was again raised, defendant, trustee ROBERT "RABBIT" KIERNAN became irate and pointed his finger in plaintiff's face while screaming, stated, among other threats that, "if I was not a village trustee, you know what I would do to you". Defendant, trustee ROBERT "RABBIT" KIERNAN also fraudulently misrepresented to the Village Board that he had a telephone conversation with JOHN BYRNES JR., in which plaintiff consented and approved of JERRY LOMANGINO being promoted to the position of Lieutenant. This conversation never took place.

31. Despite such threats and intimidation, and the failure of the remaining Village Board members to properly investigate this issue and take appropriate

-16-

action, plaintiff continued to pursue this investigation, especially in light of JERRY LOMANGINO'S appointment as Lieutenant.

32. On January 16, 2007, the Village Board met, and, without any written charges against plaintiff, or without a hearing, sworn testimony under oath, or the opportunity to cross examine or call witnesses, or to be heard, the defendants, without a record demoted plaintiff from his vested position of "Chief of Police", after unlawfully referring to him as "Officer in Charge", to the lowest level of "patrol officer", in violation of law and in the absence of due process. The defendants knew or should have known that their actions both substantively and procedurally deprived the plaintiff of liberty and property without due process of law in the following particulars:

a) No Notice of Charges was provided to enable the plaintiff to present his case.

b) No administrative law judge or hearing officer presided to ensure an independent and objective finding.

c) No record was made of the proceeding which deprived the plaintiff of the fundamental right of review.

d) No statements of witnesses were given under oath.

–17–

e) Plaintiff was not advised of his right to cross examine witnesses appearing against him. In fact, no such witnesses even appeared.

f) The Village Board acted as prosecutor and finder of fact.

g) Despite hearing no evidence which would have proved dereliction of duty, the defendants arbitrarily and capriciously determined that they had sufficient information to summarily demote plaintiff and thereafter to arbitrarily remove him from the work schedule.

The defendants have no legitimate reason for demoting plaintiff from the position of "Chief of Police" or referring to him as "Officer in Charge" of the Village of Montgomery Police Department. On the contrary, the refusal of the defendants to continue to employ plaintiff as "Chief of Police", and/or their referral of plaintiff as "Officer in Charge" is arbitrary and capricious and based primarily on his medical condition and his attempts to undertake and complete a legitimate police investigation, which is a duty imposed upon him by law. The actions of the defendants, including their intentional disclosure of plaintiff's confidential personnel and medical information, and the continuous acts of slander and libel in the public and through newspapers of general circulation alleging plaintiff committed crimes and was a pedophile, are a part of a pattern of

–18–

such actions establishing a reckless disregard and indifference to due process for which punitive damages in an amount deemed reasonable by the Court should be awarded.

33. The defendants, while acting under color of state law, then unlawfully appointed John Luffman in lieu of the plaintiff to the permanent position of "Chief of Police" or "Officer in Charge" of the Montgomery Police Department.

### Post-Demotion: Harassment, Slander and Libel

34. Without authorization, defendants JERRY LOMANGINO and ROBERT "RABBIT" KIERNAN, for the purpose of intimidating plaintiff and causing his termination of employment from the department, then unlawfully copied confidential "C-forms" kept by the Village of Montgomery Police Department and transmitted them to the FBI, together with publishing reckless accusations that plaintiff was guilty of criminal conduct involving the illegal purchase, possession, and/or sale of firearms, although said defendants knew that such accusations were totally false. Defendants also circulated, as rumor, the allegation that plaintiff was smuggling guns overseas, and that plaintiff was involved in illegal international gun purchases and/or sales. These statements were published at a time when said defendants knew that every gun that plaintiff

–19–

has ever purchased was properly recorded and  stored in safety deposit vaults in

the Village of Montgomery Police Department, or in his personal residence safe

and that plaintiff had not committed any criminal act.

35.  That the slanderous statements so made by these defendants were

made knowing that these statements would also be published, in writing, by the

Times Herald-Record in the following libelous article and read by the general

public.

36.  On January 26, 2007, the Times Herald-Record did publish an article

that reported that the FBI was investigating gun purchases made by Village of

Montgomery police officers while JOHN BYRNES, JR. was head of the

department and that the plaintiff was involved in illegal activities.  A copy of that

libelous article, which was published in that newspaper of general circulation,

was read by the general public, and is annexed hereto and made a part hereof as

Exhibit "B".  Three days prior to that publication, Chief Luffman was advised by

Mayor STEVE BRESCIA that defendants, JERRY LOMANGINO and ROBERT

"RABBIT" KIERNAN were working on a "big case" involving plaintiff, thereby

implying that the plaintiff was the target of a criminal investigation.

–20–

37.  On or about June 23, 2007, to further intimidate plaintiff and cause

him to resign, plaintiff's sister, Carol J. Monroe, was approached by an unmarked

police vehicle driving at a very slow rate of speed while she was standing outside

of her parked car on Clinton Street in the Village of Montgomery.  The police

vehicle continued to pass her very slowly, causing her to fear for her safety and

flee.  When she returned to her car, the unmarked police vehicle then pulled up

alongside her vehicle, and blocked her from any means of exit.  After an

unreasonable delay, the police vehicle then moved and she was allowed to

proceed to her father's residence.  During this time, the operator of the unmarked

police car continued to harass the plaintiff's sister by stopping, slowing down,

and parking beside her vehicle.  After contacting the State Police to report the

incident, she learned that the operator of the unmarked police vehicle was

defendant, Lt. JERRY LOMANGINO.

38.  On August 12, 2007 while plaintiff was driving his vehicle westbound

on River Street in the Town of Montgomery, he encountered defendant, trustee

ROBERT "RABBIT" KIERNAN operating his vehicle on that public street while

heading eastbound.  Suddenly, the defendant caused his vehicle to cross over into

the westbound lane directly in front of plaintiff, and, to avoid a head on collision

–21–

and serious personal injury, plaintiff was forced off the road and onto its

shoulder.  Defendant ROBERT "RABBIT" KIERNAN then pulled his vehicle up

next to plaintiff's parked vehicle and cursed at plaintiff.  Plaintiff pulled back

onto the road and proceeded to his sister's house on Weaver Street to report the

incident.

39.  While traveling eastbound on Weaver Street, plaintiff again observed

defendant ROBERT "RABBIT" KIERNAN operating his vehicle heading

westbound at a high rate of speed.  Again, defendant, trustee ROBERT

"RABBIT" KIERNAN crossed into the eastbound lane directly in front of

plaintiff's vehicle. Fearing a second head-on collision and serious personal injury,

plaintiff again was forced from the road and onto its shoulder.  Defendant then

pulled his motor vehicle up beside plaintiff's vehicle and became verbally

abusive.

40.  On August 16, 2007, at approximately 5:15 P.M., while plaintiff was

standing in front of the Village of Montgomery Police Station and in the presence

of the general public, defendant ROBERT "RABBIT" KIERNAN drove in front

of the station and while operating his vehicle at a slow rate of speed, extended his

arm out of the driver's side window and pointed his finger directly at plaintiff and

–22–

shouted "I am going to get you, you fucking pedophile." Defendant, ROBERT

"RABBIT" KIERNAN then parked in the police station parking lot and while

speaking with Chief Luffman, made a kissing motion in the direction of plaintiff

and pointed at his crotch and said "did you run out of little boys." He also yelled

towards JOHN J. BYRNES, JR., "You're a pedophile, suck my dick".

41. The following day, on August 17, 2007, defendant, ROBERT

"RABBIT" KIERNAN, parked his vehicle in the business district of the Village

of Montgomery with a sign affixed to his vehicle's window which stated

"Mothers and Fathers Beware For Your Children, Jack Byrnes is in Town".

42. On October 10, 2007, during a Village Board meeting, defendant,

LINDA CANTIELLO again stated, "I want Jack Byrnes fired because he will not

be meeting his hours". Since April, 2007, in an effort to force the plaintiff's

resignation, the defendants have restricted plaintiff to 3 to 4 shifts per month; less

than the required hours, although plaintiff has always submitted his availability

for work.

43. That the foregoing acts by the defendants were ratified and/or

condoned by the Village Board of the Village of Montgomery and the VILLAGE

–23–

OF MONTGOMERY, without any effort to correct, curtail, or ameliorate such illegal conduct by the defendants.

44. That through the foregoing course of conduct of intimidation, the defendants, for the purpose of depriving the plaintiff of his tenured position of "Chief of Police" and livelihood in law enforcement, have, with actual malice, both orally and/or in writing, disclosed confidential medical and personnel information, and published untrue and false, slanderous information, and the publication of the foregoing libelous article concerning the plaintiff accusing him of the commission of crimes and acts of moral turpitude, with total and reckless disregard for the truth of such allegations.

45. That due to the foregoing acts of the defendants, plaintiff, JOHN BYRNES JR., has been deprived of his livelihood, tenured position, and reputation in the community.  He has been burdened with unjustified apprehension and unease.  He has sustained conscious pain and suffering and he has been damaged in his personal, social, and business life and reputation.

46. That due to the anxiety caused by the defendants' acts, plaintiff, JOHN BYRNES JR.'s medical condition has been substantially aggravated.

47. Due to the aforesaid ongoing course of conduct by the defendants, plaintiff's employment has been willfully and maliciously terminated, without due process and without any just cause.

48. The reason for such demotion was due to the false and defamatory statements and illegal actions of the defendants which are set forth above.

49. That the defendants knew at the time they recklessly released such privileged and/or false information to the media and general public that the accusations against plaintiff were made for the purpose of causing plaintiff's demotion from "Chief of Police"; and that all the information so released was confidential in nature and not for public dissemination and disclosure.

50. Defendants also knew that their foregoing publications to third parties and the general public, constituted allegations that plaintiff had committed malfeasance and crimes, and their publications would cause plaintiff great expense, inconvenience, public humiliation, economic distress, economic loss, conscious pain and suffering, and injury to his good name, reputation, and in his position as "Chief of Police" and that plaintiff would be required to seek and obtain, at great expense, legal and medical counseling and assistance.

51. As a result of the defendants' unlawful acts and public disclosure of his medical and personnel matter, plaintiff did sustain great expense, inconvenience, public humiliation, mental anguish and pain, emotional distress, and economic loss, conscious pain and suffering and injury.

### AS AND FOR A FIRST CAUSE OF ACTION UNDER FEDERAL LAW ALLEGING A VIOLATION OF 28 U.S.C § 1331, and 42 U.S.C. § 1983

52. Plaintiff, JOHN BYRNES JR., repeats and reiterates paragraphs 1 through 51 of his complaint with the same force and effect as if their content were fully set forth at length herein.

53. That the aforesaid acts of the defendants entitle plaintiff to a declaratory judgment that the aforementioned discriminatory actions of defendants were and still are unconstitutional.

54. That plaintiff, during the pendency of this action, is entitled to a preliminary, and thereafter, a permanent injunction reinstating him, retroactively as of January 16, 2007, to the position of "Chief of Police", and thereafter restraining defendants from again terminating and/or demoting plaintiff from the position of "Chief of Police" and/or referring to him as "Officer in Charge" without due process.

–26–

55.  That plaintiff is entitled to the reimbursement for all salary payments and other benefits lost by him as a result of the unconstitutional actions of the defendants due to his unlawful demotion from the position of "Chief of Police" in a sum to be determined by this honorable Court.

56.  That plaintiff is entitled to the reasonable costs of attorney fees incurred by plaintiff in this action due to the unconstitutional actions of the defendants which resulted in his unlawful demotion, in a sum to be determined by this honorable Court.

57. That plaintiff is entitled to compensatory damages for all injuries he sustained since January 16, 2007 as a result of his unconstitutional demotion, and he is entitled to exemplary, treble and punitive damages due to the unconstitutional actions of the defendants, in a sum to be determined by this honorable Court, with or without a jury.

## AS AND FOR A SECOND CAUSE OF ACTION
## UNDER FEDERAL LAW ALLEGING
## HIPPA VIOLATIONS

58. Plaintiff, JOHN BYRNES JR., repeats and reiterates paragraphs 1 through 28, 32 and 51 of his complaint with the same force and effect as if their content were fully set forth at length herein.

–27–

59. The defendants unlawfully, without just cause, disseminated plaintiff's confidential medical and personnel information to the media and through the newspapers of general circulation to the general public.

60. That plaintiff is entitled to federal statutory prescribed penalties and/ or damages as a result of the defendants' unlawful dissemination and publication of his medical information, in a sum to be determined by this honorable Court with or without a jury.

### AS AND FOR A THIRD CAUSE OF ACTION UNDER STATE LAW FOR SLANDER AGAINST DEFENDANT ROBERT "RABBIT" KIERNAN

61. Plaintiff, JOHN BYRNES JR., repeats and reiterates paragraphs 1 through 51 of his complaint with the same force and effect as if their content were fully set forth at length herein.

62. On August 16, 2007, at approximately 5:15 P.M., the defendant, ROBERT "RABBIT" KIERNAN, while in the police station public parking lot, in the presence of numerous persons, made a kissing motion in the direction of plaintiff and pointed at his crotch and said "did you run out of little boys". He further stated "I am going to get you, you fucking pedophile". Thereafter, on or about August 17, 2007, the defendant, ROBERT "RABBIT" KIERNAN, libeled

–28–

plaintiff by virtue of the incident more particularly set forth in paragraph 41 herein.  By the foregoing statements, the defendant expressly and by inference, slandered the plaintiff and alleged that plaintiff was a pedophile and that he had committed acts of moral turpitude and that plaintiff was unworthy to be appointed to the public office of "Chief of Police" and to operate a security business within the Village of Montgomery, the plaintiff sustained general damages to his social and business reputation, his good name and other economic damages, including but not limited to the loss of business customers and clientele together with his embarrassment in the community and the tarnishing of his reputation as a law enforcement officer in good standing, within the State of New York.

63.  Upon information and belief, that as a result of the actions of this defendant, the plaintiff has suffered great mental and physical distress and was subjected to humiliation, embarrassment and scorn among those who knew him and the general public and his vocation was severely interrupted.

64.  As a result of these untrue accusations, plaintiff has sustained extreme damages in his business and personal life and was otherwise greatly injured in his character and reputation.

–29–

65.  That as a result of the foregoing, the plaintiff has sustained damages heretofore alleged herein to his reputation, business, profession, personal and social life and special damages through the loss of his business clients, in the sum of five million dollars ($5,000,000.00) representing compensatory damages and he is entitled to exemplary, punitive, and treble damages against these defendants for their reckless publication of the foregoing slanderous and libelous allegations in the sum of fifteen million dollars ($15,000,000.00) no part of which has been paid notwithstanding due demand.

### AS AND FOR A FOURTH CAUSE OF ACTION UNDER STATE LAW FOR LIBEL AGAINST DEFENDANTS ROBERT "RABBIT" KIERNAN AND LT. JERRY LOMANGINO

66.  Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 65 of his complaint, with the same force and effect as if those allegations were fully set forth at length herein.

67.  That the defendants, on or about January 26, 2007, by their unlawful investigation, release of privileged and confidential documents and slanderous accusations that plaintiff had committed crimes, including, but not limited to the purchase, possession and/or sale of illegal weapons, knowing that said

–30–

accusations would be published in writing in newspapers of general circulation, as is set forth in Exhibit "B" did libel plaintiff by the dissemination of the foregoing false and malicious libelous publications, published to numerous residents within the Village and Town of Montgomery, did also verbally slander and accuse the plaintiff of having committed various criminal and/or morally corrupt acts, including, but not limited to those more particularly set forth above.

### AS AND FOR A FIFTH CAUSE OF ACTION UNDER STATE LAW FOR DEFAMATION OF CHARACTER AGAINST ALL DEFENDANTS

68.  Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 67 his complaint, with the same force and effect as if those allegations were fully set forth at length herein.

69.  By virtue of the actions of the defendants, plaintiff's character, reputation, good will in his personal life and business, has been defamed, without any just cause or without any fault of the plaintiff.

### AS AND FOR A SIXTH CAUSE OF ACTION UNDER STATE LAW FOR MALICIOUS TERMINATION OF EMPLOYMENT AGAINST ALL DEFENDANTS

–31–

70.    Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 69 his complaint, with the same force and effect as if those allegations were fully set forth at length herein.

71.    That the foregoing acts of the defendants were done without just cause but with malice against the plaintiff.

72.    By virtue of plaintiff's unlawful demotion and defendants' refusal to allow plaintiff to maintain his position as "Chief of Police" and/or their referral to plaintiff as "Officer in Charge"; by their modification of the terms of his employment; and by their refusal to allow him to meet the minimum hours of employment, their actions constitute malicious termination of employment.

### AS AND FOR A SEVENTH CAUSE OF ACTION UNDER STATE LAW FOR INTENTIONAL INFLICTION OF MENTAL DISTRESS AGAINST ALL DEFENDANTS

73.    Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 72 his complaint, with the same force and effect as if those allegations were fully set forth at length herein.

74.    The actions of the defendants include numerous complaints made to federal agencies, including the FBI, alleging that the plaintiff was committing crimes, which the defendants knew were baseless at the time they made them.

–32–

75.  These illegal activities by defendants, included libel, slander, violations of plaintiff's civil rights, and other actions which rose to the level of falsely reporting an incident in the third degree contrary to § 240.50 (3) of the New York penal law.

76.  The foregoing repeated acts of the defendants therefore amounted to extreme and outrageous conduct which transcended the bounds of decency as to be regarded as atrocious and intolerable in a civilized society and constitute actions which have intentionally or recklessly caused plaintiff to suffer severe emotional distress.

77.  Defendants knew their conduct would cause plaintiff to suffer severe emotional distress and that his emotional health suffered as a result of their acts.

78.  As such, defendants' unjustified acts, intended to interfere and deprive plaintiff of his livelihood, constitute intentional infliction of emotional distress.

## DEMAND FOR A JURY TRIAL

79.  Plaintiff demands a jury trial of all the issues in this action.

## REQUESTED RELIEF

**Wherefore, plaintiff demands judgment in his favor and against the defendants, as follows:**

–33–

**1. On his first Federal cause of action alleging a violation of 28 U.S.C. § 1331, and 42 U.S.C.§ 1983:**

a.  Declaring that the aforementioned discriminatory actions of defendants were and still are unconstitutional;

b.  Granting plaintiff, preliminarily, during the pendency of this action, and permanently thereafter, an injunction against the defendants, directing the reinstatement of plaintiff to the position of "Chief of Police", retroactively as of January 16, 2007, and thereafter restraining the defendants from terminating and/or demoting plaintiff from that position, in the future, without just cause and due process.

c.  Granting plaintiff compensatory damages representing the reimbursement to plaintiff of all salary payments, and other benefits he lost as a result of the unconstitutional actions of the defendants, in a sum to be determined by this honorable Court, with or without a jury.

d.  Granting plaintiff compensatory damages for the reasonable costs of his attorney's services which were incurred by plaintiff due to the unconstitutional actions of the defendants, in a sum to be determined by this honorable Court.

e. Granting plaintiff exemplary, treble and punitive damages due to the malicious and unconstitutional actions of the defendants, in a sum to be determined by this honorable Court, with or without a jury, and

**2. On his second Federal cause of action alleging violations of HIPPA:**

a. Judgment in plaintiff's favor and against the defendants for sanctions and penalties, together with compensatory damages plaintiff sustained, in a sum to be determined by this honorable Court, with or without a jury.

**3. On his third cause of action under state law for slander against defendant Robert "Rabbit" Kiernan:**

a. Judgment in plaintiff's favor and against defendant, Robert "Rabbit" Kiernan, for compensatory damages in the sum of five million dollars ($5,000,000.00) and fifteen million dollars ($15,000,000.00) for exemplary, punitive and treble damages.

**4. On his fourth cause of action under state law for slander and/or libel against defendants Robert "Rabbit" Kiernan and Lt. Jerry Lomangino:**

a. Judgment in plaintiff's favor and against defendants, Robert "Rabbit" Kiernan and Lt. Jerry Lomangino, for compensatory damages, in the sum of five

-- 35 --

million dollars ($5,000,000.00) and fifteen million dollars ($15,000,000.00) for exemplary, punitive and treble damages.

    5. **On his fifth cause of action under state law for defamation of character:**

    a. Judgment in plaintiff's favor and against the defendants for compensatory damages and exemplary, punitive and treble damages in amounts deemed reasonable by this honorable Court, with or without a jury.

    6. **On his sixth cause of action under state law for malicious termination of employment:**

    a. Judgment in plaintiff's favor and against the defendants for compensatory damages and exemplary, punitive and treble damages in amounts deemed reasonable by this honorable Court, with or without a jury.

    7. **On his seventh cause of action under state law for intentional infliction of mental distress**

    a. Judgment in plaintiff's favor and against the defendants for compensatory damages and exemplary, punitive and treble damages in amounts deemed reasonable by this honorable Court, with or without a jury.

All the foregoing, together with such other and further relief as to this

honorable Court may deem just and proper under the circumstances, and the costs

and disbursements of this action.

Dated: November 16, 2007

Yours, etc.

EDWARD J. CARROLL, ESQ.
Attorney for Plaintiff
2733 Route 209
Kingston, New York 12401
(845) 338-5977

TO:   STEVEN BRESCIA, Mayor of
      the Village of Montgomery,
      LINDA CANTIELLO,
      ROBERT "RABBIT" KIERNAN,
      DARLENE ANDOLSEK, and
      JOANN SCHEELS, Constituting
      the Trustees of the Village Board
      of the Village of Montgomery,
      Lt. JERRY LOMANGINO of the Village
      of Montgomery Police Department,
      and THE VILLAGE OF MONTGOMERY
      133 Clinton Street, Montgomery,
      New York, County of Orange, 12549

# News

## Changes loom for Montgomery police

By Alexa James
November 27, 2006

and Oliver Mackson

Times Herald-Record
Montgomery — The burning question in the Village of Montgomery these days is, "What's up with Jack?"
Meaning Jack Byrnes Jr., officer in charge of the village's police department.
He's been out of the country for about three months and his return date isn't circled on anyone's calendar. Meanwhile, big changes are looming for one of Orange County's last remaining part-time police forces.
"I think he's supposed to come home in December," Mayor Steve Brescia said last week. "Then he'll have to let us know what he's going to do. We do plan to sit down with him when he gets back."
There's a lot to sit down and talk about. The Village Board is pondering the hiring of the village's first full-time cops. There's a new union-organizing drive in the department.
And about two weeks ago, elected officials from the Village of Montgomery, the Town of Montgomery and the Village of Maybrook discussed whether they should combine their three police departments.
There's not a lot of crime in Montgomery, a village of 3,600 people at the crossroads of Route 17K and Route 211. Last year, the most serious crimes village police handled were 12 larceny complaints and one call about a stolen vehicle.
The same year, by comparison, police in the Village of Highland Falls, where the population is about the same as Montgomery, recorded 50 serious crimes, seven of them violent, according to the state Department of Criminal Justice Services.
Byrnes, 46, is a Montgomery native. His full-time gig is in the private security business. He's chairman and chief executive officer of Allstate Security Inc., based in Montgomery.
Earlier this year, Byrnes was setting up a new security venture in the Dominican Republic. Around Sept. 11, Brescia said, Byrnes was due to fly back to the U.S. to have surgery for a stomach infection, a complication resulting from a prior procedure. But Byrnes became ill, couldn't fly home and had the surgery in the Dominican Republic.
"He's still stuck down there," Brescia said last week.
Even before Byrnes took sick, the Village Board was asking questions about accountability. Trustee Bob Kiernan, who retains his high school-athlete nickname of "Rabbit" around the village, wants Byrnes to be more accountable for documenting the hours he works. Brescia said some part-timers have been exceeding their hours; others aren't working enough, and the department has had trouble filling day shifts.
"There's a lot of people switching their shifts or calling out. We wanted more effective scheduling, too," he said. There are now 32 part-timers patrolling the village. Brescia would like to see that number below 20. "We're considering hiring two to four full-timers," he said.
Last summer, village police ticketed two truck drivers for E. Tetz & Sons, the concrete company where Kiernan works.
One of the tickets was written for driving 36 mph in a 30 mph zone. The other was for driving 37 mph in a 30 mph zone. Kiernan also got a recent ticket charging him with failure to signal a turn and failure to properly display a registration sticker.
"Did it strike me, personally, as a form of harassment? To anybody who knows the history of the village in the last six months — perhaps," Kiernan says. That's about how long he's been asking pointed questions about how the police department is run.
Kiernan is quick to add, "I'm very happy with the people we have right now, running the show." The highest-ranking fill-in for Byrnes is Capt. John Luffman, a retired NYPD member who has worked in Montgomery for 13 years.
"I've been a supervisor for probably half of that, plus NYPD," Luffman said. "So I really don't have a problem stepping in his (Byrnes') shoes, and for the most part, even when he was around, I was running the show," he added.
"I think that a lot of the public are very happy with the way that the police department is run."
Brescia was born and raised in Montgomery. He also represents it in the Orange County Legislature. He's not optimistic that the consolidation being discussed with Maybrook and the Town of Montgomery will happen anytime soon.
But, he says, "we'd still like to put the numbers together."
As for Kiernan, who's the Village Board's liaison with the police department, Brescia said, "I think they (some officers) feel that Rabbit hasn't been fair to them. I think he has."

## Opinion

### Change, law enforcement and the Village of Montgomery

Sometimes, it seems the more things change in the mid-Hudson, the more they stay the same in the Village of Montgomery. And it seems that in this small village of 3,600 people — known best for its overzealous ticketing of speeders — the good ol' boy network is alive and well.

How else do you explain why Jack Byrnes Jr. is still in charge of the village police department, despite not having been seen in town for more than three months? Word is that Byrnes, whose full-time gig is private security, went down to the Dominican Republic a few months ago for a security job, got sick and hasn't been able to return. In his absence, though, the village is finally considering making some changes in one of the county's last part-time police departments.

The proposed changes include hiring a few full-time officers and cutting back on the part-time staff. The village has 32 part-time officers on staff. Mayor Steve Brescia said he'd like to see that number below 20. Village trustee Robert Kiernan said he'd like to see more accountability within the department as well. Brescia points to recent trouble getting day shifts staffed, officers exceeding hours and others not putting in enough. Kiernan said he'd also like to see a better record of the hours Byrnes is putting in.

All of the requests that have been suggested seem reasonable, even desirable for the department to progress. But not everyone seems happy with the suggestions. There's been talk of officers targeting trucks from the business where Kiernan works in retaliation for his requests. Kiernan himself received tickets for failing to signal a turn and failing to display his registration.

While no one can say for sure that's happened, it wouldn't be the first time Byrnes or his department was linked to some shady goings-on.

Byrnes himself has been the target of lawsuits, the center of controversy and the subject of much, oft-times unpleasant, speculation. He was overseeing the department in 1999 when 5,000 rounds of ammo disappeared and again when his officers were accused of faking hours they worked and double-billing both the village and the sheriff's department mere months later.

He was at the center of controversy again in 2001 when police were called to his home in the middle of the night after Byrnes said a man he'd given a ride home from a bar had pulled a knife and threatened to kill him. That ride turned out to be in a police cruiser, with an officer behind the wheel. Seems the folks around town refer to it as the "blue taxi."

People said Byrnes never faced the music in town — indeed, he received a hefty raise after the 2001 incident — because his father, Jack Byrnes Sr., sat on the police commission for years. No conflict there, right?

The truth is, it's time for some changes in the Village of Montgomery's Police Department. And since all effective change begins at the top, it seems the time is right for Jack Byrnes Jr. to finally step down. What Montgomery needs is a professional force run by trained and respected men and women whose primary concern is the safety and well-being of residents.

By all reports, retired NYPD member and current Montgomery Capt. John Luffman (the man filling Byrnes' empty chair) might be just the man the village needs.

Montgomery needs to send the message that no one in the village is above the law. And that has to include Jack Byrnes.

# News
## Byrnes' future on force unclear

By Alexa James
December 07, 2006

Times Herald-Record
Montgomery — Jack is back.

He's still on medical leave, but Jack Byrnes Jr., officer in charge of the village police department, has returned from a three-month hiatus in the Dominican Republic.

Though he's stateside again, the Montgomery native's future as head of the tiny village's sizable police force remains unsettled. Village officials said Byrnes has submitted a doctor's excuse, extending his leave at least one more month. Asked if he'll return after that, Byrnes said, "I'm not sure yet."

On Tuesday night, Byrnes made his first public appearance in Montgomery after his extended absence. He attended a Village Board meeting, demanding to join the trustees and Capt. John Luffman — the NYPD veteran acting as supervisor in Byrnes' absence — in a closed-to-the-public executive session about police personnel.

"It matters to me," Byrnes told the board. "I have a lot of input about what's going on."

The public wasn't privy to the ensuing discussion, but Trustee Bob Kiernan, who serves as the village police liaison, said yesterday that he thinks Byrnes should resign. "In all reality," he said, "Jack Byrnes hasn't been available or accountable to this village for the last year and a half."

Byrnes said yesterday that Kiernan never addressed those remarks to him. Asked if he's offended by the board's increased supervision over his department, Byrnes said, "I have no response. I'm not going to play tit-for-tat in the paper."

The Village Board is considering a reduction of force — the department has 31 part-time officers — and tightening officers' schedules.

As the department's only salaried employee, Byrnes is budgeted to earn $20,426 annually for his part-time role as officer in charge of the department. Byrnes' title is bestowed by the village; holding a police chief's title requires a cop to pass a Civil Service test.

Brescia said Byrnes was not paid during his hiatus. Given his extended absences, the village clerk was unclear yesterday as to how much money Byrnes had actually earned this year or how many hours he'd worked.

Byrnes, 46, has frequented the Dominican Republic throughout the year, the mayor said, setting up a new private security business. Byrnes also runs the Montgomery-based Allstate Security Inc.

Staff writer Oliver Mackson contributed to this report.

## News
## Session on Byrnes' future turns into shouting match in Montgomery

By Alexa James and Oliver Mackson
December 21, 2006

Montgomery - When a closed-door session of Montgomery trustees snowballed into a profane shouting match Tuesday night, the Village Board tried turning up the Christmas carols to drown out the F-bombs.

When the din subsided, Trustee Bob Kiernan had resigned as village police liaison, citing "absolutely no cooperation." Kiernan wanted to reorganize the department from the top down, starting with Officer-in-Charge Jack Byrnes, who has been out of the country more than in during the past 18 months. Byrnes "should no longer be involved in any executive sessions," Kiernan said, "or have any stature of any importance."

Mayor Steve Brescia said the village will deal with Byrnes when he returns from the Dominican Republic, where he has been setting up a private security company and recuperating from unspecified health problems.

Brescia is facing mounting pressure as villagers question how their chief can travel to and from the tropics but not do desk work at the station. "It's going to come to a head Jan. 16," said Brescia, when Byrnes' latest doctor's excuse expires and the board meets again.

In the interim, Capt. John Luffman is heading the department. Brescia said he will not immediately appoint a new police liaison in hopes that Kiernan reverses his decision.

# Job future could be at stake for Montgomery's top cop

## Village might oust Byrnes

By Alexa James
Times Herald-Record
ajames@th-record.com

Montgomery — For years, Jack Byrnes Jr. traveled in circles a lot bigger than this village of 600 people.

Sure, he was the part-time officer in charge of the village's police department. But he also chaired an honorary major's shield in the Orange County Sheriff's Office and worked as a volunteer with then-Sheriff Frank Bigger's drug task force. He ran a private security company with big contracts, including protecting the massive Newburgh Auto Auction.

Byrnes' annual Christmas party was a see-and-be-seen event that drew state-level politicians. Last year, there was even some talk that Byrnes might be a candidate for sheriff himself.

But Orange County is changing, and a harbinger of that change came when the month of December came and went without invitations going out to the big Christmas party. Byrnes hasn't spent much time in Montgomery since the summer, because he's been tending to a new business and recuperating from an illness.

And now Byrnes may be one vote away from losing command of the police department, where he's been a fixture for 24 years. He's never held the civil service rank of chief.

The Village Board is expected to take up the question of Byrnes' future at a meeting tomorrow night.

Two village trustees now say that Byrnes should go, and while the three members aren't going that far, they still have plenty of questions for Byrnes.

Between hernia surgery and the startup of a new security venture in the Dominican Republic, Byrnes hasn't worked his alloted 80 hours a month since August, Mayor Steve Brescia says. He hasn't been paid since then, either.

Byrnes put in about four months of work last year, the mayor said, earning about 30 percent of his $20,426 annual salary. But technically, he's still in charge of the department, Trustee Robert "Rabbit" Ki-

erman was the first to call for Byrnes' resignation. Trustee Linda Cantiello now says that she agrees with Kiernan.

"It's time for Jack to be replaced. That's the bottom line," Cantiello says.

After Kiernan called for Byrnes' resignation last month, Byrnes' lawyer, Ed Bruno of Pine Bush, wrote Kiernan a letter that warned, "If you make slanderous statements against my client, I will have no choice but to take whatever action is appropriate to protect my client's interests, which could include a lawsuit against you for defamation of character."

Bruno sent copies of the letter to the entire board. Cantiello said, "It sounded like a scare tactic."

Bruno wouldn't say which of Kiernan's remarks were taken by Byrnes as slanderous. Brescia, Trustee Darlene Andolsek and Trustee JoAnn Scheels all said Bruno shouldn't have copied his letter to the entire Village Board.

"It's inappropriate. It may have been something to try to hush Rabbit, but Bob is a grown-up and Bob is going to say what he's going to say, Jack and Bob are having a bit of a tiff,

and I think it should be between them," Scheels said.

But Byrnes' work situation? That, the trustees agreed, is something that's in the public sphere.

Byrnes has a note from a doctor that says he can't do police work, but the note expires tomorrow — the night that the Village Board meets.

"I think with all his medical problems, maybe he should consider retiring," Scheels said.

"He truly doesn't seem to be able to be there all the time. Not that he does a bad job - he just hasn't been there. He's been out sick for a quite a while now, and is that fair to the people in the village?"

Trustee Darlene Andolsek said, "Right now, he's on medical leave. He can't help that, nor can I. But we need somebody that's here ... I think that's of utmost importance."

Brescia says the village could consider demoting Byrnes and permanently appointing Capt. John Luffman as the officer in charge. Luffman's been running the department in Byrnes' absence.

Byrnes couldn't be reached at either of two cell-phone numbers last week.

The Village Board expects him to show up tomorrow night.

## News

## Montgomery police head Jack Byrnes Jr.'s job could be at stake

By Alexa James
January 15, 2007

and Oliver Mackson
Times Herald-Record

Montgomery — For years, Jack Byrnes Jr. traveled in circles a lot bigger than this village of 3,600 people.

Sure, he was the part-time officer in charge of the village's police department. But he also carried an honorary major's shield in the Orange County Sheriff's Office and worked as a volunteer with then-Sheriff Frank Bigger's drug task force.

He ran a private security company with big contracts, such as protecting the massive Newburgh Auto Auction.

Byrnes' annual Christmas party was a see-and-be-seen event that drew state-level politicians. Last year, there was even some talk that Byrnes might be a candidate for sheriff himself.

But Orange County is changing, and a harbinger of that change came when the month of December came and went without invitations going out to the big Christmas party.

Byrnes hasn't spent much time in Montgomery since the summer, because he's been tending to a new business and recuperating from an illness.

And now Byrnes may be one vote away from losing command of the police department, where he's been a fixture for 24 years, including 15 as officer in charge. He's never held the civil service rank of chief.

The Village Board is expected to take up the question of Byrnes' future at a meeting tomorrow night. Two village trustees now say that Byrnes should go, and while the Village Board's other three members aren't going that far, they still have plenty of questions for Byrnes.

Between hernia surgery and the startup of a new security venture in the Dominican Republic, Byrnes hasn't worked his alloted 80 hours a month since August, Mayor Steve Brescia says. He hasn't been paid since then, either.

Byrnes put in about four months of work last year, the mayor said, earning about 30 percent of his $20,426 annual salary. But technically, he's still in charge of the department.

Trustee Robert "Rabbit" Kiernan was the first to call for Byrnes' resignation. Trustee Linda Cantiello now says that she agrees with Kiernan.

"It's time for Jack to be replaced. That's the bottom line," Cantiello says.

After Kiernan called for Byrnes' resignation last month, Byrnes' lawyer, Ed Bruno of Pine Bush, wrote Kiernan a letter that warned, "If you make slanderous statements against my client, I will have no choice but to take whatever action is appropriate to protect my client's interests, which could include a lawsuit against you for defamation of character."

Bruno sent copies of the letter to the entire board. Cantiello said, "It sounded like a scare tactic."

Bruno wouldn't say which of Kiernan's remarks were taken by Byrnes as slanderous. Brescia, Trustee Darlene Andolsek and Trustee JoAnn Scheels all said Bruno shouldn't have copied his letter to the entire Village Board.

"It's inappropriate. It may have been something to try to hush Rabbit, but Bob is a grown-up and Bob is going to say what he's going to say. Jack and Bob are having a bit of a tiff, and I think it should be between them," Scheels said.

But Byrnes' work situation? That, the trustees agreed, is something that's in the public sphere.

Byrnes has a note from a doctor that says he can't do police work, but the note expires tomorrow — the night that the Village Board meets.

"I think with all his medical problems, maybe he should consider retiring," Scheels said. "He truly doesn't seem to be able to be there all the time. Not that he does a bad job — he just hasn't been there. He's been out sick for a quite a while now, and is that fair to the people in the village?"

Trustee Darlene Andolsek said, "Right now, he's on medical leave. He can't help that, nor can I. But we need somebody that's here "¦ I think that's of utmost importance."

Brescia says the village could consider demoting Byrnes and permanently appointing Capt. John Luffman as the officer in charge. Luffman's been running the department in Byrnes' absence.

Byrnes couldn't be reached at either of two cell-phone numbers last week.

The Village Board expects him to show up tomorrow night.

# News
## Montgomery demotes Byrnes, sells bikes

By Alexa James
January 17, 2007

Montgomery - Village trustees dealt a stinging one-two punch to the long-time head of the police department last night, demoting Officer-in-Charge Jack Byrnes Jr. to part-time patrolman and selling the Harley-Davidson motorcycles he championed for his department.

The blows were delivered before a crowd of glowering Byrnes' faithful at Village Hall, who vowed to avenge the administration's decision during upcoming elections in March.

"When the dust settles, these people will be gone," said John Ingrassia, nodding toward the dais, "and Byrnes will be back." "They created that monster," he said.

Problems with Byrnes, 54, have been festering for months. Between stomach surgery and the startup of a new security venture in the Dominican Republic, Byrnes put in only about four months of work last year.

Last month, when the board extended his medical leave, Byrnes spent most of it in the tropics, flying home in time to ask for another extension last night.

The board gave him four more weeks but this time requested a medical examination from an independent physician, not Byrnes' go-to doctor.

"We've been very sensitive to his health problems," said Mayor Steve Brescia, but, "we need somebody at the helm."

That somebody is now Capt. John Luffman, who was been running the department in Byrnes' absence.

The village trustees also voted to surplus the two Harley-Davidson motorcycles Byrnes ordered for his force in 2004. The bikes will be offered at a minimum bid of $10,000 each.

And while the board insisted its motions were made on behalf of the village, Byrnes is taking it personally.

"I will not stand by and permit ignorant and self-serving people to discredit my name or my dedication to this police department and the Village of Montgomery," Byrnes wrote in a statement to the Times Herald-Record Monday. He said his lawyer will take action by the end of the week.

In fact, Byrnes said he may make a run for the mayor's seat in March. "Mayor Byrnes," he said, "how does that sound?"

**PAGES 4-5**

# ITGOMERY BOARD DEMOTES TOP COP

*FRONT PAGE*

Times Herald-Record , Wednesd

# Village demotes Byrnes, sells bikes

**By Alexa James**
Times Herald-Record
ajames@th-record.com

Montgomery – Village trustees dealt a stinging one-two punch to the long-time head of the police department last night, demoting Officer-in-Charge Jack Byrnes Jr. to part-time patrolman and selling the Harley-Davidson motorcycles he championed for his department.

The blows were delivered before a crowd of glowering Byrnes' faithful at Village Hall, who vowed to avenge the administration's decision during upcoming elections in March.

"When the dust settles, these people will be gone," said John Ingrassia, nodding toward the dais, "and Byrnes will be back."

"They created that monster," he said.

Problems with Byrnes, 54, have been festering for months. Between stomach surgery and the startup of a new security venture in the Dominican Republic, Byrnes put in only about four months of work last year.

Last month, when the board extended his medical leave, Byrnes spent most of it in the tropics, flying home in time to ask for another extension last night.

The board gave him four more weeks but this time requested a medical examination from an independent physician, not Byrnes' go-to doctor.

"We've been very sensitive to his health problems," said Mayor Steve Brescia, but, "we need somebody at the helm."

That somebody is now Capt. John Luffman, who was been running the department in Byrnes' absence.

The village trustees also voted to surplus the two Harley-Davidson motorcycles Byrnes ordered for his force in 2004. The bikes will be offered at a minimum bid of $10,000 each.

And while the board insisted its motions were made on behalf of the village, Byrnes is taking it personally.

"I will not stand by and permit ignorant and self-serving people to discredit my name or my dedication to this police department and the Village of Montgomery," Byrnes wrote in a statement to the Times Herald-Record Monday. He said his lawyer will take action by the end of the week.

In fact, Byrnes said he may make a run for the mayor's seat in March. "Mayor Byrnes," he said, "how does that sound?"

## News
### Feds probe Village of Montgomery cops' gun buys while Jack Byrnes ran department

By Oliver Mackson
January 26, 2007

and Alexa James
Times Herald-Record
Montgomery — The feds are investigating gun purchases made by Village of Montgomery police officers while longtime Officer in Charge Jack Byrnes Jr. was running the department, according to people familiar with the investigation.
Those people say that at least one federal law-enforcement agency is assembling a paper trail to track the movement of the guns — including documents pertaining to the private security business that is Byrnes' bread-and-butter.

In one case, a source said that the FBI received copies of handgun sale slips documenting purchases by Byrnes. Those records are normally kept by the state police Pistol Permit Bureau, which documents all legal handgun transactions in New York.
The reason for the investigation isn't clear, and Jim Margolin, an FBI spokesman, said he had no comment. Montgomery Mayor Steve Brescia learned about it from a reporter, and Byrnes laughed it off.
"No comment," he said, chuckling during a long-distance phone call Wednesday. Byrnes runs Allstate Security in Montgomery, and recently expanded his security business to the Dominican Republic. The new venture has kept him away from the village and cost him his officer-in-charge status last week.
While he's been the officer in charge, Byrnes has employed some village cops as security officers with his private company. The village hasn't received any recent requests from any law-enforcement agency for information about Byrnes or the police department, according to the village's response to a Freedom of Information Law request by the Times Herald-Record.
Byrnes said he hasn't been contacted by the FBI.

Since he was stripped of his title last week, Byrnes himself has papered Village Hall with FOIL requests. Byrnes' lawyer also threatened to sue a village trustee who said Byrnes ought to resign.
After the Village Board's vote to demote him, Byrnes sounded an angry new note. Byrnes now says he might run for mayor against Brescia.
They've been friends since they were both kids growing up in the village in the late 1960s, and Byrnes has supported Brescia during his nearly 17 years in the mayor's office. As of yesterday, Brescia was the only candidate who'd filed any campaign paperwork at Village Hall.
On Byrnes' watch, Montgomery has developed a reputation as a safe place to live. Cars traveling into the village from Route 211 hit the brakes well before the speed limit drops from 55 mph to 30 mph. A daily phenomenon: At least one police car, with its flashers working, is posted to watch the kids arriving and leaving from Montgomery Elementary School.

But Byrnes' management of the police department has been questioned. And now, for the first time, even the mayor is saying that the village can't afford another "black eye" at the hand of Byrnes.
"The trouble is, I've been friends with him for 30 years," Brescia said this week. "Over the last two years, I don't really know Jack."
That's because his old friend has spent more time out of the country than he has in the village lately. Between complications from hernia surgery and the startup of his new security venture in the Dominican Republic, Byrnes hasn't worked his allotted 80 hours a month at the police station since August. All told, he put in roughly four months of work last year, the mayor said, earning about 30 percent of his $20,426 annual salary. But until his demotion last week, Brynes was still running the show.
The officer in charge is now John Luffman, a 13-year veteran of the department who's retired from the NYPD. Luffman said he was unaware of any federal investigation of Byrnes.
"Jack Byrnes is not that silly or that stupid to do something like that," Luffman said, stressing that his friendship with Byrnes hasn't been affected by the recent uproar. "I can bet his desk on it, and I can do that because I'm sitting at it right now."

# When neighbors attack

*April 26, 2007*

## Former friends in Montgomery trash each other



'SO, THIS BRUISER PUTS A CEMENT MIXER ON A FISH'

LOCAL WRESTLERS EXPLAIN THEIR LANGUAGE

PAGE 45

# TIMES HERALD-RECORD

SERVING THE HUDSON VALLEY AND THE CATSKILLS

FRIDAY, JANUARY 26, 2007

www.recordonline.com

50 CENTS

Jack Byrnes

PAGE 3

$12.7B

WORST LOSS IN FORD'S HISTORY

PAGE 2

ORANGE NORTH EDITION

VILLAGE OF MONTGOMERY

# EX-TOP COP IN FED GUN PROBE

A lead-contaminated squirrel was found in the area two years...

Ford Motor Co. reported a...

# Montgomery gun probe

## Feds check village cops' purchases while Jack Byrnes headed force

By Alexa James
and Oliver Mackson
Times Herald-Record
ajames@th-record.com
omackson@th-record.com

Montgomery – The feds are investigating gun purchases made by Village of Montgomery police officers while longtime Officer In Charge Jack Byrnes Jr. was running the department, according to people familiar with the investigation.

Those people say that at least one federal law-enforcement agency is assembling a paper trail to track the movement of the guns – including documents pertaining to the private security business that is Byrnes' bread-and-butter.

In one case, a source said that the FBI received copies of handgun sale slips documenting purchases by Byrnes. Those records are normally kept by the state police Pistol Permit Bureau, which documents all legal handgun transactions in New York.

The reason for the investigation isn't clear, and Jim Margolin, an FBI spokesman, said he had no comment. Montgomery Mayor Steve Brescia learned about it from a reporter, and Byrnes laughed it off.

"No comment," he said, chuckling during a long-distance phone call Wednesday. Byrnes runs Allstate Security in Montgomery, and recently expanded his security business to the Dominican Republic. The new venture has kept him away from the village and cost him his officer-in-charge status last week.

While he's been the officer in charge, Byrnes has employed some village cops as security officers with his private company.

The village hasn't received any recent requests from any law-enforcement agency for information about Byrnes or the police department, according to the village's response to a Freedom of Information Law request by the Times Herald-Record. Byrnes said he hasn't been contacted by the FBI.

Since he was stripped of his title last week, Byrnes himself has papered Village Hall with FOIL requests. Byrnes' lawyer also threatened to sue a village trustee who said Byrnes ought to resign.

After the Village Board's vote to demote him, Byrnes sounded an angry new note. Byrnes now says he might run for mayor against Brescia.

They've been friends since they were both kids growing up in the village in the late 1960s, and Byrnes has supported Brescia during his nearly 17 years in the mayor's office. As of yesterday, Brescia was the only candidate who'd filed any campaign paperwork at Village Hall.

On Byrnes' watch, Montgomery has developed a reputation as a safe place to live. Cars traveling into the village from Route 211 hit the brakes well before the speed limit drops from 55 mph to 30 mph. A daily phenomenon: At least one police car, with its flashers working, is posted to watch the kids arriving and leaving from Montgomery Elementary School.

But Byrnes' management of the police department has been questioned. And now, for the first time, even the mayor is saying that the village can't afford another "black eye" at the hand of Byrnes.

"The trouble is, I've been friends with him for 30 years," Brescia said this week. "Over the last two years, I don't really know Jack."

That's because his old friend has spent more time out of the country than he has in the village lately. Between complications from hernia surgery and the startup of his new security venture in the Dominican Republic, Byrnes hasn't worked his allotted 80 hours a month at the police station since August. All told, he put in roughly four months of work last year, the mayor said, earning about 30 per cent of his $20,426 annual salary. But until his demotion last week, Brynes was still running the show.

The officer in charge is now John Luffman, a 13-year veteran of the department who's retired from the NYPD. Luffman said he was unaware of any federal investigation of Byrnes.

"Jack Byrnes is not that silly or that stupid to do something like that," Luffman said, stressing that his friendship with Byrnes hasn't been affected by the recent uproar. "I can bet his desk on it, and I can do that because I'm sitting at it right now."


Jack Byrnes


Steve Brescia


Times Herald-Record photos/JEFF GOULDING
Sources say federal agents are assembling a paper trail of gun purchases by Village of Montgomery cops while Byrnes headed the department.